# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

JOHNNY PHILAVANH,

    Plaintiff,

vs.

NANCY A. BERRYHILL, Acting Commissioner, Social Security Administration,

    Defendant.

Case No.: 2:15-cv-01796-GWF

**ORDER**

**Re: Motion for Reversal and Remand (ECF No. 24)**

This matter is before the Court on Plaintiff Johnny Philavanh's Complaint for Review of Final Decision of the Commissioner of Social Security (ECF No. 3), filed on March 18, 2016. The Acting Commissioner filed her Answer (ECF No. 9) on May 20, 2016. Plaintiff filed his Motion for Reversal and Remand (ECF No. 24) on December 8, 2016. The Acting Commissioner filed her Cross-Motion to Affirm the Agency's Decision (ECF No. 27) on February 2, 2017. Plaintiff did not file a reply. Pursuant to the written consent of the parties, this case was referred to the undersigned United States Magistrate Judge on July 7, 2017 to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. *See Reference Order* (ECF No. 29).

## BACKGROUND

### A. Procedural History.

Plaintiff filed an application for a period of disability, disability insurance benefits and supplemental Social Security Income on February 13, 2012, alleging that he became disabled beginning February 19, 2011. *See* Administrative Record ("AR") 153-161. The Commissioner denied Plaintiff's applications initially on April 27, 2012, AR 91-94, and upon reconsideration on January 30, 2013. AR 97-103. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 105-106. The

hearing was conducted on September 4, 2013 at which Plaintiff appeared and testified. AR 33-63. The ALJ issued his decision on January 3, 2014 and concluded that Plaintiff was not disabled from February 19, 2011 through the date of the decision. AR 18-27. Plaintiff's request for review by the Appeals Council was denied on July 17, 2015. AR 1-4. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

**B.　Factual Background.**

Plaintiff Johnny Philavanh, a native of Laos, was born on July 9, 1967. AR 183. He came to the United States when he was fifteen years old and finished the eleventh grade of school. AR 40. Mr. Philavanh is able understand, speak, and write a little in English, but is primarily fluent in the Laotian language. AR 36-37. He was employed as a casino porter at Caesars Palace Hotel-Casino from 1988 until 2003. He then worked as a food-runner at Excalibur Hotel-Casino from 2004 to 2005. He worked as a driver-messenger or courier for Southwest Courier from June 2005 until March 2010. AR 192. As a casino porter, Mr. Philavanh was required to walk and stand 8 hours a day. He frequently lifted 25 pounds. The maximum weight he lifted was 50 pounds. He noted that he lifted mop buckets, dust pans, and a vacuum, which he carried everywhere. AR 193. As a food-runner, Mr. Philavanh walked and stood for 8 hours a day. He frequently lifted 25 pounds. He lifted meat, milk, vegetables, fruits, and dishes. AR 194. As a driver-messenger, Mr. Philavanh worked 10 hours a day and would walk or stand for up to 10 hours, and sit for 4 hours. He frequently lifted 25 pounds and occasionally lifted 50 pounds. He lifted bags and boxes to and from a car to load onto an airplane. AR 195.

Mr. Philavanh injured his back in a motor vehicle in 2009. The administrative record does not contain any medical records regarding any treatment that Plaintiff may have received shortly after this accident. Mr. Philavanh stated in his January 15, 2013 Function Report that he "got hit by a drunk driver and injured my lower back and neck." AR 218. He told Dr. Trevor Nogueira in October 2013 that his car slowed down at a red light and he was "rear ended by a Chevy pickup truck." AR 489.

**1. Medical Records.**

The administrative record contains a May 7, 2009 lumbar spine MRI report obtained by Plaintiff's chiropractor. AR 320. The report stated that at L3-4, there was congenital narrowing of the spinal canal, mild facet arthrosis, normal lateral recesses and patent neural foramina. At L4-5, there was

disc dessication, mild decreased disc space height, posterior annular tear with an associated 2 mm broad-based posterior disc protrusion, which in addition to the congenital narrowing of the spinal canal, contributed to narrowing of the midsagittal dimension of the thecal sac to approximately 7 mm. There was mild facet arthropathy and patent neural foramina. At L5-S1, there was normal disc hydration with preservation of the disc height. There was mild congenital narrowing of the spinal canal with midsagittal diameter of 10 mm, mild facet arthrosis, and patent neural foramina.

Mr. Philavanh initially saw Dr. Alafuro Oruene, a pain management physician, on April 7, 2010. AR 242-245. He told Dr. Oruene that he had been experiencing low back pain for more than one year. The pain was continuous and he described it as a burning, stabbing pain which radiated to his left lower extremity on the sides and back. The pain was aggravated by daily activities of bending and lying down. Mr. Philavanh also reported that the pain was aggravated a few weeks earlier when he tried to exercise. He stated that he could "barely stand." Mr. Philavanh reported that his current pain level was 10/10. The pain was "alleviated by standing and sitting in between." Her stated that he was currently working. AR 242.

Under "Review of Systems," Dr. Oruene noted that the findings were normal in most body parts or systems. Under "Neck," the report stated: "Denies pain or swelling." Under "Musculoskeletal," the report stated: "Back pain." AR 243. Under "Examination," Dr. Oruene noted that Plaintiff was 5'2" tall and weighed 162 pounds. He appeared to be a well developed, well nourished male who was in mild distress. AR 243-244. Examination findings regarding Plaintiff's neck were reported as: "Supple, no JVD, carotid 2+ without bruits. No thyromegaly appreciated on exam." The musculoskeletal examination findings were as follows: "Normal flexion and extension of the C-Spine. Flexion 80 deg. and extension 5 deg of the lumbar sacral spine. Nor paraspinal muscle tenderness. Positive facet loading on the left. Normal range of motion for all joints. SLR Positive Left at 30 deg." AR 244. Dr. Oruene's assessment was low back pain, lumbosacral radiculopathy, sciatica, and lumbar facet syndrome. Due to Plaintiff's level of discomfort, Dr. Oruene scheduled him for lumbar injections and stated that he would request a lumbar spine MRI. (There is no record of a lumbar spine MRI other than the one obtained in May 2009.) Dr. Oruene also prescribed Percocet medication.

Mr. Philavanh received lumbar spine injections on April 8, 2010. On April 16, 2010, he reported

that his pain level was 7/10. On July 8, 2010, Plaintiff reported that his pain level was 6/10. AR 246-261. Dr. Oruene noted that Plaintiff got some relief from the epidurals, but was now reporting pain in the right shoulder and elbow. Plaintiff stated that his pain had to do with constant opening and closing of doors in his job as a courier. AR 258. Thereafter, his low back pain level remained in the 6/10 to 7/10 level. On September 8, 2010, Plaintiff underwent a discogram at L1-2, L2-3, L3-4, L4-5, and L5-S1. The results were positive at L3-4 and L4-5.

Mr. Philavanh saw Dr. Oruene on an approximate monthly basis for his low back pain through July 8, 2013. These office visits usually resulted in a refill or change of prescription pain medication. Plaintiff declined surgical intervention for his low back condition. AR 292 (December 30, 2010); AR 296 (February 24, 2011). The "Review of Systems" and "Examination" sections of Dr. Oruene's reports remained the same throughout his treatment of Plaintiff. Dr. Oruene did not update these sections as Plaintiff's condition and medical care progressed. For example, the "Review of Systems" section consistently stated that Plaintiff denied neck pain or swelling even after he began complaining of severe neck pain on March 29, 2011. AR 331-332. The "Examination" findings regarding Plaintiff's neck and musculoskeletal system also did not change from Dr. Oruene's April 7, 2010 report through his report on July 8, 2013. AR 243-244, 484-485. Dr. Oruene's reports also continued to state that Plaintiff was working even though Plaintiff testified that he stopped working in February 2011. AR 41-43, 45-46, 483.

Plaintiff first reported severe neck pain to Dr. Oruene on March 29, 2011. The doctor revised his assessment of Plaintiff's condition to include "Tendonitis, Unspecified 726.9; Right Shoulder and Elbow improved; Cervicalgia (723.2); and Cervical Radiculitis (723.4). AR 333. Dr. Oruene obtained an MRI of the cervical spine on April 26, 2011 which stated that there was a 2 mm posterior disc osteophyte complex at C4-5. There was also moderate left neuroforaminal narrowing and the spinal canal measured 0.8 cm. At C5-6, there was a 2 mm posterior disc osteophyte complex. The spinal canal measured 0.8 cm. At C6-7 there was a 3 mm posterior disc osteophyte complex. The spinal canal measured 0.8 cm and there was moderate left neuroforaminal narrowing. AR 300.

Dr. Oruene administered cervical spine injections to Plaintiff on May 3, 17, and June 1, 2011. AR 302, 304, 306, 339, 342, 349. On June 6, 2011, Mr. Philavanh stated that his low back pain was at

6/10 and his neck pain was at 5/10. He also reported that the neck pain radiated into both hands with numbness and tingling. Dr. Oruene noted that Plaintiff's neck pain was better, but his back pain was the same. AR 344. In July 2011, Plaintiff reported that his neck pain was 2/10 and was much better. AR 347. On August 8, 2011, however, Plaintiff reported that his neck pain was 3/10. He stated that it was "recurring" and he wanted to repeat the injections. AR 350. Dr. Oruene administered additional cervical spine injections on August 9, 2011. AR 354. In a followup visit on September 9, 2011, Plaintiff reported that his neck pain at 3/10. AR 356. On October 5, 2011, however, it had increased to 6/10. His low back pain was at the same level, which was consistent with his prior low back pain levels. AR 359. Plaintiff received another cervical spine injection on November 10, 2011. AR 366. On November 18, 2011, his neck pain was 6/10. AR 368. On December 12, 2011, it was 8/10. Plaintiff also reported increased low back pain at 7/10. AR 372. On January 10, 2012, Plaintiff reported neck pain at 9/10. Dr. Oruene also noted in this report that Plaintiff was applying for Social Security Disability. AR 376.

On April 2, 2012, Plaintiff went to the University Medical Center ("UMC") complaining of chronic low back and neck pain. He told the emergency room physician that he wanted surgery for his neck and back. He stated that this was recommended to him by his physician in 2009 and 2010, "but [he] has never been able to arrange this as he does not have any money." AR 381. There is no indication in Dr. Oruene reports that he recommended neck surgery to Plaintiff. He had apparently discussed low back surgery with Plaintiff, and the latter declined it. AR 292, 294. The UMC doctor's physical examination of Plaintiff's neck on April 2, 2012 showed that it was supple. There was no midline tenderness and Plaintiff had full flexion/extension of the neck. With regard to the musculoskeletal system, the doctor stated: "He has no step-offs or tenderness to the T spine. Some mild tenderness over the lower L4-L5 segments of the L-spine, but no step-offs or deformities. " Another UMC doctor evaluated Plaintiff and stated: "I see no indications for emergent surgery or imaging. He does not sound like he has any acute worsening of his symptoms, but he did run out of his pain medications this morning and says he does not have any insurance. I think he definitely does need to be seen by an ortho spine specialist." AR 382. The doctor stated that he would provide Plaintiff with a referral to see a Dr. Vater. *Id.* There is no record showing that Plaintiff consulted with an orthopedic

specialist after this emergency room visit.

Plaintiff saw Dr. Oruene on April 6, 2012. There was no mention in that report of his recent visit to the emergency room or any referral to an orthopedic specialist. AR 417. Over the next year and three months, Plaintiff continued to report severe low back and neck pain usually at the 8/10 level for both areas. AR 420, 423, 426, 429, 432, 439, 443, 447. On February 28, 2013, Plaintiff told Dr. Oruene that he was going to Thailand for a family emergency. AR 467. He did not see Dr. Oruene during the month of March. On April 11, 2013, his condition appeared to be unchanged from his previous visit. AR 471. Dr. Oruene's last office visit report on July 8, 2013 described Plaintiff's current condition as follow:

> Johnny's pain is continuous. He describes the pain as low back pain 8/10, burning, stabbing, radiating to the left lower extremity on the sides and the back. Neck pain 8/10, radiates to both hands with numbness and tingling, and is aggravated by daily activities, bending, laying down, and is alleviated by standing and sitting in between helps the pain. He is currently working.

AR 483.

This is substantially identical to the description of Plaintiff's condition in Dr. Oruene's preceding office visit reports after Plaintiff began reporting neck pain in March 2011, with the exception of complaints of increased pain levels for both neck and back pain.

Dr. Oruene wrote an August 7, 2013 letter to Plaintiff's attorney in which he stated that Plaintiff received "multiple interventions," including epidural injections, facet blocks, and physical therapy. (There is no indication in his reports that Plaintiff received physical therapy.) He stated that Plaintiff's pain had continued and persisted; that he had decreased flexion and extension in his lower back; difficulty lifting anything over 10 pounds; "[d]ifficulty standing for prolonged periods of time over 10 minutes without having to sit for a short period of time, then standing again to relieve his pain symptoms." He also stated that Plaintiff was unable to climb long flights of stairs due to back pain. Dr. Oruene stated that Plaintiff "was unable to obtain any gainful employment because of the painful condition of his neck and back[,]" and that he was totally disabled. AR 487.

Mr. Philavanh was also seen by Dr. Suhattai Gamnerdsiri between January 14, 2010 and May 15, 2012 for his other medical conditions or problems. AR 393-409. Dr. Gamnerdsiri made occasional references to Plaintiff's complaints of neck or back pain, but did not evaluate or treat those conditions.

6

Mr. Philavanh was examined by Dr. Trevor Nogueira at the request of the Bureau of Disability Adjudication on October 16, 2013. AR 488-500. Plaintiff told Dr. Nogueira that he was filing for Social Security Disability due to neck and low back pain. He described his neck symptoms as radiating to the upper extremities in a circumferential distribution. His low back symptoms also radiated circumferentially, including the abdomen and down the left leg between the knee and ankle. At the time of examination, Plaintiff pain level was "10." Both his neck and back pain were aggravated by walking, sitting, or standing too long. Coughing or sneezing also aggravated his pain. Medications helped his neck pain a little, but gave him 80% relief from his back pain. Plaintiff stated that the spinal injections did not help him. AR 488-489.

Dr. Nogueira noted on examination that superficial palpation aggravated the symptoms in the neck and back. Simulation of axial rotation aggravated the low back symptoms and grimacing was noted on simulation. Straight leg raising in a sitting position was 80 degrees each bilaterally, and was 0 degrees bilaterally in the supine position. Waddell's Sign was 4/5. Grip strengths were 16 pounds on the right, 11 pounds on the left. Plaintiff stated that his grip was limited due to pain. AR 489. Plaintiff walked with a cane which he had obtained himself. Dr. Nogueira noted "[i]ncidentally, the patient is able to stand on his heals and toes." He did a partial squat and complained of low back pain. The neurological examination was normal. Examination of the deep tendon reflexes was symmetrical. The Hoffman's reflex test was within normal limits. Dr. Nogueira's assessment was chronic cervical and lumbrosacral strains with no neurologic deficits noted at time of examination. AR 490.

Dr. Nogueira stated that, ideally, a functional capacity evaluation would address Plaintiff's work ability. In the absence of a separate evaluation, Dr. Nogueira provided his assessment on an attached form. AR 490. He stated that Plaintiff had the ability to lift up to 10 pounds frequently and 20 pounds occasionally. He could frequently carry 10 pounds. He could sit for one hour, stand for 30 minutes and walk for 30 minutes without interruption. During an 8 hour workday, he could sit for 4 hours, stand for 2 hours and walk for 2 hours. He did not require a cane to ambulate. With respect to use of hands, he was limited to occasional overhead reaching and pushing or pulling, but could frequently reach in other directions, and engage in frequent handling, fingering and feeling. Plaintiff could frequently operate foot controls.

Dr. Nogueira stated that Plaintiff should never climb ladders and scaffolds. He could occasionally climb stairs and ramps, stoop, kneel, crouch and crawl. He could frequently balance. He did not have hearing or visual impairments. Plaintiff should never be exposed to unprotected heights or moving mechanical parts. He could occasionally operate a motor vehicle and be exposed to extreme cold. He could frequently be exposed to humidity and wetness, dust, odors and fumes, extreme heat and vibrations, and loud noise. He could perform the following activities: shopping; traveling without the assistance of a companion; ambulate without a wheelchair, walker, canes or crutches; walk one block at a reasonable pace on rough or uneven surfaces; use public transportation; climb a few steps at a reasonable pace; prepare simple meals and feed himself; care for his personal hygiene; and handle or use paper files. AR 492-498.

Mr. Philavanh was also examined by Dr. Zev Lagstein on November 7, 2013 at the request of the Bureau of Disability Adjudication. AR 501-503. Dr. Lagstein found that Plaintiff had a significantly greater physical residual functional capacity than did Dr. Nogueira. AR 504-509.

In addition to the reports of the examining physicians, Dr. Jon Arnow, a state agency physician, reviewed the record and prepared a residual functional capacity assessment on April 24, 2012. Dr. Arnow stated that Mr. Philavanh cold occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for four hours with normal breaks; sit for about six hours with normal breaks; had unlimited ability to push and/or pull, other than as shown for lift and/or carry; could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl; and was able to frequently balance. Plaintiff had limited ability to reach overhead, but had unlimited ability for handling, fingering and feeling. Plaintiff had no visual or communicative limitations. He had no environmental limitations regarding extreme cold or heat, wetness, humidity, noise, vibrations or fumes and odors. He was to avoid all exposure to hazards such as machinery or heights. AR 64-73.

**2.      Plaintiff's Hearing Testimony and Function Reports.**

Mr. Philavanh testified at the September 4, 2013 hearing that he stopped working because of pain. The pain medications also made it dangerous for him to drive a motor vehicle. AR 46. He stated that when the "medicine is gone then the pain comes back. I can't even move." "[E]verything in my

body I cannot move because of pain." The pain medication made him dizzy and sleepy. AR 46. Plaintiff testified that he had been using a cane for over two years. His pain was so bad that most of the time he could not even walk. He could not perform a sit-down job because he could not sit very long due to low back pain. Plaintiff initially testified that he no longer drove an automobile. He then stated that he drove to a supermarket three weeks prior to the hearing and that he drove to the supermarket twice a month. During a typical or normal day, he sat or lay on the sofa, took medication and watched television. AR 47-48.

Mr. Philavanh testified that he had been living with his sister and brother-in-law for three years. He did not perform any household chores. His sister did the cooking. He sometimes went outside to the backyard, but did not go out to attend religious services, or go to restaurants, movies or other social events. Plaintiff stated that he could stand on his feet for about five minutes. He could walk twenty steps on a level surface, and could sit in a chair for five to ten minutes. He believed he could lift five to ten pounds. AR 48-49. Plaintiff testified that the pain in his neck and back awoke him every five to ten minutes during the night. He napped five or six times during the day. He had problems taking a bath or shower and getting dressed. He used his cane to brace himself when showering. His legs were weak and he sometimes felt as if he had no legs. He frequently fell. When he coughed, he had severe pain in his neck and shoulders. AR 51-52. He also had headaches which made it difficult to concentrate. AR 53.

Plaintiff submitted a January 15, 2013 function report which was consistent with his hearing testimony. AR 218-225. Plaintiff's sister also submitted a third party function report. AR 207-214. She stated that Plaintiff could not lift anything and that he slept all day because his medications made him sleepy. His back hurt when he was laying down unless he took medicine. Plaintiff took care of his personal hygiene, but had difficulty doing so. AR 208. The sister prepared his meals and did the shopping. Plaintiff did not perform housework or yard work because of his back pain and medications. Plaintiff's sister had never seen him go outside. Plaintiff's hobby or activity was watching television. AR 209-210. The sister stated that Plaintiff could only walk about fifteen feet before needing to stop and rest for one or two minutes before resuming. AR 211.

**3.     Vocational Expert's Testimony.**

Vocational expert Kenneth Lister testified at the hearing. AR 53-61. He stated that Plaintiff's

previous work as casino porter or busboy was medium level work. His jobs as a food-runner and courier were light work. AR 53. The ALJ asked the vocational expert to assume a hypothetical individual who was of the same age, education and experience as Plaintiff, and who was capable of working at the light exertional level with all postural requirements, except that the individual could never climb ropes, ladders or scaffolds. The individual would also have to avoid concentrated exposure to hazardous machinery. AR 53-54. The ALJ asked whether such a hypothetical individual would be able to perform any of Plaintiff's past work. The vocational expert testified that he could not work as a porter or busboy, but could work as a food runner or courier. AR 54. The hypothetical individual could perform other light jobs that were available in substantial numbers in the national economy, including ticket taker, ticket seller, production assembler, and parking lot attendant. The hypothetical individual could also perform sedentary jobs that were available in substantial numbers in the national economy, including assembler in the optical industry, semiconductor bonder, and touch-up screener. AR 54-55.

The ALJ asked whether the hypothetical individual would be able to perform any of Plaintiff's past jobs if he could only do occasional overhead lifting, bilaterally. The vocational expert testified that he could work as a food runner, but not as a courier. The individual could also work as a ticket taker, ticket seller, production assembler, parking lot attendant, final assembler, semiconductor bonder, touch-up screener, and surveillance system monitor. AR 56-58. If the individual was further limited to only occasional fingering and handling with the right upper extremity, then he could not perform the jobs of ticket taker, ticket seller, production assembler, parking lot attendant, final assembler, semi-conductor bonder or touch-up screener. AR 57-58. Under questing by Plaintiff's counsel, the vocational expert testified that the availability of the light and sedentary jobs would be eroded if the person could not speak English or was functionally illiterate. All of the jobs would be eliminated if the person had to lay down periodically to relieve pain, was off-task 15 percent or more during the day due to pain, or missed three or more days of work during the month due to pain. AR 60-61.

**C.  Administrative Law Judge's July 8, 2011 Decision.**

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration in determining whether Plaintiff was disabled. AR 19-20. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. He also

found that Plaintiff had not engaged in substantial gainful activity since February 19, 2011. AR 20. At step two, the ALJ found that Plaintiff had the following severe impairments: disorders of the back. (20 CFR 404.1520(c) and 416.920(c)). He noted that Plaintiff had a history of right shoulder pain, but did not find this to be a severe impairment. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). AR 20-22.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), with the following additional limitations: Plaintiff could perform all postural movements frequently, except he could not climb ropes, ladders or scaffolds. He could only occasionally reach overhead bilaterally and could only occasionally push or pull with his upper extremities. AR 23. Based on this residual functional capacity, the ALJ found at step four that Plaintiff could not perform any of his past relevant work. AR 26. At step five of the sequential process, the ALJ stated that if Plaintiff was able to perform the full range of sedentary work, a finding of not disabled would be directed by Medical-Vocational Rule 201.25 and Rule 201.19. Because Plaintiff's ability to perform sedentary work was impeded by additional limitations, the ALJ relied on the vocational expert's testimony that even with the additional limitations Plaintiff could perform the sedentary jobs of final assembler, semiconductor bonder, touch-up screener and surveillance monitor. AR 27. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from February 19, 2011 through the date of his decision. AR 27-28.

## DISCUSSION

### I. Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v.*

*Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

**II.    Disability Evaluation Process**

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists

in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). The five steps of the sequential process are correctly stated in the ALJ's decision, AR 19-20, and will not be repeated here.

### III. Whether the ALJ Erred In Rejecting the Credibility of Plaintiff's Statements and Testimony regarding the Severity of His Neck and Back Pain.

Plaintiff challenges the ALJ's decision solely on the grounds that he failed to articulate specific, clear and convincing reasons for rejecting the credibility of Plaintiff's testimony regarding the severity of his symptoms. *Motion for Reversal* (ECF No. 24), pgs 4-13. Plaintiff also argues that the ALJ failed to consider his fibromyalgia. *Id.* at pg. 10. There is no evidence in the administrative record, however, that Plaintiff was ever diagnosed with or even suspected of having fibromyalgia. Although the ALJ gave greater weight to the opinions of the examining physician, Dr. Nogueira, and the reviewing physician, Dr. Arnow, than he did to the opinions of Plaintiff's treating physician, Dr. Oruene, Plaintiff does not challenge that part of the decision.

The Social Security regulations describe a two step process for evaluating a claimant's symptoms such as pain, fatigue, shortness of breath, weakness or nervousness. First, the adjudicator must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms. 20 C.F.R. § 404.1529 and § 416.929; (SSR) 96-7p (1996). Once such an underlying physical or mental impairment is established, the adjudicator is required to evaluate the intensity, persistence, and limiting effects of the claimant's

symptoms to determine the extent to which they limit his functioning. In making this determination, the adjudicator must consider the entire record. *Id.* Unless there is affirmative evidence showing that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the credibility of the claimant's testimony regarding the severity of his pain or other symptoms. *Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014) (citing *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012)); *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). The ALJ must state the reasons why the testimony is unpersuasive, and must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (2009) (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).

In determining credibility, the ALJ may engage in ordinary techniques of credibility evaluation. *Molina*, 674 F.3d at 1112  The ALJ may consider inconsistencies either in the claimant's testimony or between the claimant's testimony and the claimant's conduct, such as unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. The ALJ may also consider whether the claimant engages in daily activities inconsistent with the alleged symptoms. *Id.* "While a claimant need not 'vegetate in a dark room' in order to be eligible for benefits, . . . the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Id.* at 1112-13 (internal citations omitted).

The ALJ may also consider (1) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (2) factors that precipitate and aggravate the symptoms; (3) the type, dosage, effectiveness, and side-effects of pain medication; (4) treatment, other than medication, that the individual receives or has received for relief of pain; (5) any measures other than treatment the individual uses or has used to relieve pain; and (6) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p; *Burch v. Barnhart*, 400 F.3d at 680. As these factors indicate, medical records can provide relevant information that adversely effects the credibility of Plaintiff's testimony regarding the severity of his symptoms. For example, medical records indicating that a claimant denied pain or reported only mild pain in a particular body part, may properly be used to discount his later claims of severe pain in that body part. The ALJ may not, however, reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully

corroborate the severity of his pain. The rationale for this restriction is that pain testimony may establish greater limitations than can medical evidence alone. *Burch v. Barnhart*, 400 F.3d at 680 (citing SSR 96–7p).

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms. AR 23. He also listed the factors set forth in Social Security Ruling (SSR) 96-7p that should be considered in assessing the credibility of a claimant's pain testimony. AR 22-23. In finding that Plaintiff's statements regarding the severity of his symptoms and limitations were not entirely credible, the ALJ relied on two factors: (1) Plaintiff's activities of daily living, and (2) the inconsistency between the severity of Plaintiff's alleged symptoms and the objective medical findings. AR 23-25.

The ALJ stated that "the claimant alleges that he suffers from history of disorder of the right shoulder and disorders of the back. As a result, the claimant alleges he experiences pain, cannot work, and has difficulty sleeping." AR 23. The ALJ also noted that Plaintiff alleged that he could only walk fifteen to twenty feet before he needed to stop and rest for two to three minutes, and that he had difficulty performing other physical activities. AR 23. The ALJ stated: "Despite these allegations, the claimant attends to his personal hygiene (Ex 8E). The claimant also watches television and goes out daily. Here, the claimant has described daily activities that are inconsistent with the claimant's allegations of disabling symptoms and limitations which weakens his credibility." AR 23.

The ALJ also cited a number of objective medical findings that appeared to contradict the Plaintiff's allegation of severe and disabling pain. These findings included that the Plaintiff's gait was normal; his muscle strength was five out five; his cranial nerves, sensation, and deep tendon reflexes were intact; his reflexes were symmetric; his motor and sensory functions were normal; he had only mild tenderness on the lumbar spine; he had no difficulty with balance, coordination or fine motor skills; he had normal flexion and extension of the cervical spine, but limited lumbar spine range of motion; and that although Plaintiff ambulated with a cane, he was able to partially squat and was able to stand on his heels and toes. AR 24-25.

As stated above, the ALJ cited three activities of daily living that were inconsistent with Plaintiff's allegations of disabling symptoms and limitations: (1) Plaintiff attended to his personal

hygiene; (2) he watched television; and (3) he "goes out daily." AR 23. The ALJ did not provide any further discussion of these activities or how Plaintiff performed them. In *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007), the ALJ rejected the claimant's testimony because his activities of reading, watching television and coloring in coloring books indicated that he was more functional than alleged. In reversing the denial of benefits, the court agreed with the plaintiff "that reading, watching television and coloring in coloring books are activities that are so undemanding that they cannot be said to bear a meaningful relationship to activities of the workplace." *Id.* Daily activities may be grounds for an adverse credibility finding if the claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting. The ALJ must make specific findings relating to the daily activities and their transferability. *Id.* (citing *Burch v. Barnhart*, 400 F.3d at 681). ALJs must also be especially cautious "in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of the work place environment will often be consistent with doing more than merely resting in bed all day." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014).

The record in this case does not support the ALJ's finding that Plaintiff's daily activities were inconsistent with his alleged symptoms of severe pain. Mr. Philavanh testified at the hearing that he sat on the sofa, took medication and watched television. He stated that he alternated between sitting up and laying down. AR 48. "Q. So all you do all day is sit and lay down on the couch and watch television?" "A. Yeah, most, most –." AR 49. In his January 15, 2013 function report, Plaintiff listed his only hobby or interest as watching TV. He reported, however, that he did not watch television often because it hurt too much to sit too long and that he fell asleep after taking medication. AR 222. Thus, as described by Plaintiff, his television watching was even less supportive of an ability to regularly engage in work than was *Orn's* statement that television watching is an undemanding activity.

During the hearing, the ALJ also asked Plaintiff whether he goes outside the house for any reason other than to go to the store or doctors. Plaintiff answered: "Yeah, sometimes. Very few times I go out to the backyard." AR 49. Plaintiff testified that he did not attend religious services, or go to restaurants, movies or other social events outside the home. *Id.* In his January 15, 2013 function report, Plaintiff stated that he goes outside "once a day to the backyard for fresh air." AR 221. He also stated: "I do not

go anywhere except to the doctor or get medicine with my sister." AR 222. The Commissioner points out in his cross-motion that Plaintiff testified that he was able to drive an automobile and was able to go grocery shopping twice a month. *Cross- Motion* (ECF No. 27), pg. 7. The ALJ, however, did not mention either of these activities in his decision, which, in any event were not "daily" activities according to Plaintiff.

With respect to personal hygiene or care, Plaintiff stated in his function report that he was able to perform personal care as follows: Dress: "it hurts to bend down. I have to take my time." Bathe: "I try my best and time (sic) my time." Care for hair: "it hurts especially when I turn my head to brush more." Shave: "I can shave." Feed self: "I can feed myself." Use the toilet: "it hurts. I try my best to help myself slowly." AR 219. Plaintiff testified at the hearing that he used a cane to support himself while taking a bath or shower and that he laid down while dressing himself. AR 52. There is no indication in the decision that the ALJ evaluated the extent of Plaintiff's ability to take care of his personal hygiene.

In *Garrison*, the court held that the ALJ erred by mischaracterizing the claimant's testimony regarding his daily activities. The ALJ listed the activities that claimant was able to perform, but did not discuss how she was limited in performing them. The claimant "repeatedly emphasized" that in performing many daily tasks, she was heavily assisted by her mother. She also testified that she was regularly prohibited by pain from engaging in other activities of daily living, and that after performing such activities, she was required to rest and nap several hours each day. 759 F.3d at 1015–16. In this case, the ALJ also mischaracterized Plaintiff testimony by merely mentioning the activities he was able to engage in, but providing no discussion about them. The Commissioner cites *Bubion v. Barnhart*, 224 Fed.Appx. 601, 604 (9th Cir. 2007) (unpublished) for the proposition that a claimant's testimony that she needs help or must take breaks in order to engage in daily activities, may still show that she has the capacity to perform such activities despite her pain by making the necessary adjustments. The claimant in *Bubion* was able to engage is significant activities of daily living, including caring for children, cooking, cleaning, shopping, driving, and attending church. *Id.* at 604. Mr. Philavanh testified that he was unable to engage in most of these activities, and did not perform any of them on a daily basis. AR 48-49, 220-221. The ALJ simply ignored that testimony in his decision. Finally, the third party function report submitted by Plaintiff's sister was consistent with his statements regarding his daily activities. AR 207-

214. While the ALJ could have reasonably questioned the sister's credibility due to her bias in favor of Plaintiff, his finding that her opinion was inconsistent with the claimant's activities of daily living is not supported by the record.

The other basis for the ALJ's credibility determination was that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." AR 23. As stated in *Burch*, this factor may not be the sole basis for rejecting the claimant's subjective complaints. Plaintiff saw Dr. Oruene on a regular monthly basis from April 2010 through July 2013. During that time he received injection treatments, first to the lumbar spine and then to the cervical spine. Dr. Oruene primarily prescribed pain medication to the Plaintiff. Although there were isolated periods of short term improvement in Plaintiff's subjective symptoms, his complaints of low back and neck pain remained severe and increased over time. While it appears that Plaintiff's subjective complaints of severe pain were out of proportion to the objective medical findings, there is no indication that Plaintiff failed to seek treatment or follow a prescribed course of treatment in an effort to obtain relief from his pain. Plaintiff did, however, decline surgical intervention for his low back pain.

Dr. Oruene's records raise a question as to whether he actually performed physical examinations of Plaintiff on any regular basis, or simply prescribed pain medication based on Plaintiff's subjective complaints. The other physicians who examined Plaintiff noted relative mild or essentially normal examination findings. As Dr. Lagstein noted, "somatization of symptoms is very likely." AR 503. The ALJ, however, failed to adequately evaluate the extent to which Plaintiff's subjective symptoms, while not validated by the objective medical findings, were nevertheless real and therefore credible. The ALJ therefore failed to provide specific, clear and convincing reasons for rejecting the credibility of the Plaintiff's statements and testimony regarding the severity of his pain. His finding that Plaintiff had the residual functional capacity to perform sedentary work and was not disabled must therefore be reversed.

Plaintiff argues the Court should remand this case with instructions to pay benefits. Alternatively, he argues that the Court should remand for the correction of legal errors in the ALJ's decision. *Motion for Reversal* (ECF No. 24), pgs 3-14. The Ninth Circuit has established a three-part credit-as-true standard which, if satisfied, may require the court to remand with instructions to calculate and award benefits. Under this test, the court must determine that (1) the record has been fully developed and

further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *Garrison v. Commissioner*, 759 F.3d at 1020 (citing *Ryan v. Commissioner of Social. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 640 (9th Cir. 2007); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). Although it has been held to be an abuse of discretion not to remand with direction to make payment when all three conditions are met, the credit-as-true rule may not be dispositive in all cases and envisions some flexibility. *Id.* at 1021 (citing *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003)). *Garrison* states:

> *Connett*'s "flexibility" is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that the claimant is, in fact, disabled. That interpretation best aligns the credit-as-true rule, which preserves efficiency and fairness in a process that can sometimes take years before benefits are awarded to needy claimants, with the basic requirement that a claimant be disabled in order to receive benefits. Thus, when we conclude that a claimant is otherwise entitled to an immediate award of benefits under the credit-as-true analysis, *Connett* allows flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.

759 F.3d at 1021.

The Court finds in this case that the record as a whole creates serious doubt as to whether Plaintiff was, in fact, disabled. As discussed above, Plaintiff's subjective complaints of severe pain appear to be out of proportion to the findings on examination by Dr. Oruene, the UMC physicians, Dr. Nogueira and Dr. Lagstein. Additionally, there is a legitimate question as to whether Dr. Oruene actually examined Plaintiff during the course of treatment, or simply accepted his subjective pain complaints in prescribing medication. Properly assessed and evaluated, Plaintiff may have the residual functional capacity to perform work at the sedentary level.

. . .

. . .

. . .

# CONCLUSION

The ALJ's finding that Plaintiff's testimony and statements regarding the severity of his pain were not credible was not supported by specific, clear and convincing reasons. There is, however, serious doubt as to whether Plaintiff was disabled which justifies remanding this case for further evaluation and determination on the issue of disability. Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Reversal and Remand (ECF No. 24) is **granted** and Defendant's Cross-Motion to Affirm the Agency's Decision (ECF No. 27) is **denied**.

**IT IS FURTHER ORDERED** that this matter is remanded to the Social Security Administration for a further determination of whether Plaintiff was disabled between February 19, 2011 and the ALJ's decision on January 3, 2014.

DATED this 8th day of August, 2017.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge